IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Marjo Investments, LLC,                )
                                       )    C.A. No. 6:04-22983-HMH
                 Plaintiff,            )
                                       )
        vs.                            )
                                       )    **OPINION & ORDER**
Charter Communications II, L.P.;       )
Charter Communications, Inc.;          )
Charter Communications Holdings Capital )
Corporation; and Charter Communications )
Holdings, LLC,                         )
                                       )
                 Defendants.           )

This matter is before the court on cross motions for summary judgment by Marjo

Investments, LLC ("Marjo") and Charter Communications II, L.P. ("Charter II"), Charter

Communications, Inc. ("Charter Inc."), Charter Communications Holdings Capital

Corporation ("Charter Capital"), and Charter Communications Holdings, LLC (Charter

Holdings") (collectively "Charter").  For the reasons stated below, the court grants Marjo's

motion for partial summary judgment and denies Charter's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

This case concerns a lease agreement between Marjo and Charter II, an entity created

for the purpose of entering into real estate transactions on behalf of companies affiliated with

Charter Inc.  Charter II and Marjo executed a 12-year lease agreement on May 14, 1998,

under which Marjo was to provide property in Mauldin, South Carolina, for Charter's use (the

---

[1]The court does not rely on the declarations of Michael Hollingsworth or William J.
Veatch in addressing the parties' cross motions for summary judgment.

1

"Lease"). (Pl.'s Mem. Supp. Summ. J. Appx. Tab 1 (Lease at 15).) Under the Lease,

Charter II was to pay Marjo $117,600 per year plus taxes and assessments, adjusted every

four years for changes in the Consumer Price Index. (Id. (Lease at 3).) The Lease required

Marjo to improve the property in Mauldin and construct a building to Charter II's

specifications. (Id. (Lease at 3 & Lease Ex. B (Work Letter)).) The building was

substantially complete by fall 1998. (Pl.'s Mem. Supp. Summ. J. 8.)

      The actual property which the Lease covered is disputed. The portion of the Lease

which was to contain the legal description of the property was left blank. (Id. Ex. A (Legal

Description).) Marjo alleges that the Lease was for 2.0 acres, the lot at 505 South Main

Street. (Compl. ¶¶ 10, 13; Pl.'s Reply Defs.' Countercl. ¶¶ 13, 18.) Charter asserts that the

Lease originally covered 6.15 acres, the lots at both 503 South Main Street and 505 South

Main Street, but was amended on July 16, 1999, to cover only the lot at 503 South Main

Street, without a decrease in rental amount. (Am. Answer ¶¶ 13, 52; Pl.'s Reply Defs.'

Countercl. ¶ 20.)[2] On August 14, 2000, Charter II purchased the 505 South Main Street lot

from Marjo for $360,000, $10,000 more than Marjo had paid for the 6.15 acre tract in March

1998. (Am. Answer ¶¶ 49, 54; Pl.'s Reply to Countercl. ¶ 22.)

—————————————

     [2]In the summer of 1999, Marjo sought a mortgage on the leased premises. In
connection with the underwriting process, Marjo discovered that the legal description of the
premises had been left blank when the Lease was executed. (Pl.'s Mem. Supp. Summ. J. 9.)
Marcy Lifton, one of Charter's in-house lawyers, executed the Lease for Charter in 1998 and
later executed the amendment to the Lease, which clarified that the Lease covered only the 2.0
acres located at 503 South Main Street upon which Marjo had constructed the building for
Charter. Pursuant to the mortgage lender's request, Charter provided a letter which stated
that "the Lease has not been modified and is in full force and effect." (Id. & Appx. Tab 7
(Lifton Aff. at 45-47 & Ex. 3 (Letter)).)

On March 1, 2004, Charter contacted Marjo about negotiating a termination of the Lease and inquired as to the value of the Lease to Marjo. (Pl.'s Mem. Supp. Summ. J. 12 & Appx. Tab 11 (Kathleen Carrigan Dep. at 43; Letter from Billy Jones to Brenda Lewis of 3/31/04).) Marjo responded that between April 1, 2004, and April 30, 2010, it expected to receive $813,743.46 under the Lease, and it invited Charter to make a termination offer. (Id.) There is no evidence that Charter attempted to negotiate a release from its obligations under the Lease thereafter.

On May 10, 2004, Charter II informed Marjo that it was exercising its right to void the Lease because the Lease was the product of "fraud, undue influence, and McCall's breach of fiduciary duty." (Am. Answer ¶ 57; Pl.'s Reply to Countercl. ¶ 25.) Although the parties had met their obligations under the Lease for six years, there is no evidence that Charter informed Marjo before May 10, 2004, that it considered that it had been fraudulently induced to enter into the Lease.

Charter's allegation that the Lease is void stems from the involvement of David McCall ("McCall") in the transactions between Charter II and Marjo. In 1998, McCall was Charter Inc.'s Senior Vice-President of Operations. (Am. Answer ¶ 42.) At that time, McCall had (and still has) a twenty-five percent interest in Marjo. (Am. Answer ¶ 46; Pl.'s Mem. Supp. Summ. J. Appx. Tab 3 (McCall Decl. ¶¶ 7, 13); Defs.' Mem. Opp'n Summ. J. 7.) The remaining seventy-five percent interest was held by Billy Jones ("Jones"). McCall also owned a ten-percent interest in Layjoy, LLC ("Layjoy"), a company which contracted with Charter in Georgia in much the same way that Marjo contracted with Charter in South

3

Carolina. (Defs.' Mem. Supp. Summ. J. 2-3, 7.) Jones owned forty-five per cent of Layjoy. (<u>Id.</u> 7.)

After Charter withdrew from the Lease, Marjo filed the complaint in this case on November 15, 2004, alleging that Charter is liable for breach of contract, promissory estoppel, and tortious interference of contract. In its amended answer, Charter denies liability on the Lease, claiming that the Lease and its amendment, as well as other real estate transactions concerning the property in Mauldin, were procured by fraud, undue influence, and breach of fiduciary duty. (Am. Answer ¶ 20.) Additionally, Charter asserts three affirmative defenses: (1) that Marjo fails to state a claim, (2) that Marjo's claims are barred because Charter was induced to enter the Lease by fraud, and (3) that Marjo's claims are barred by undue influence. (<u>Id.</u> ¶¶ 33-35.)

In addition to denying liability, Charter asserted counterclaims for unjust enrichment, fraud, fraudulent inducement by McCall, fraudulent inducement by Marjo, undue influence, and unfair trade practices under South Carolina Code of Laws section 39-5-2 et. seq. ("SCUTPA"). (<u>Id.</u> ¶¶ 68, 77, 88.) In response to the counterclaims, Marjo asserted numerous defenses including failure to state a claim, estoppel, unclean hands, waiver, statute of limitations, laches, and ratification. (Pl.'s Reply Defs.' Am. Countercl. 1-2.)

On July 13, 2005, Marjo and Charter filed separate motions for summary judgment.

## II.  DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B. Marjo's Motion for Partial Summary Judgment

Marjo moved for partial summary judgment on its claim for breach of lease and on all of Charter's affirmative defenses and counterclaims. After a thorough review of the record and the law applicable to this case, the court grants Marjo's motion.

Marjo first moves for summary judgment on its claim that Charter breached the terms of the Lease. It is undisputed that Charter stopped paying rent and that, unless one of the affirmative defenses precludes liability on the Lease, Charter has breached the Lease.

5

Because Charter's affirmative defenses fail, Marjo is entitled to summary judgment on its breach of lease claim.

Marjo also moves for summary judgment on all of Charter's counterclaims. The court finds that Marjo is entitled to judgment as a matter of law on all of Charter's counterclaims.

### 1. Charter's Affirmative Defenses

#### a. Failure to State a Claim

Charter's first affirmative defense is that "The Complaint fails to state a claim for which relief may be granted." (Am. Answer ¶ 33.) In its complaint, Marjo made the necessary allegations to state claims against Charter for breaching the Lease, promissory estoppel, and tortious interference with a contract. Charter has not shown how Marjo's complaint is defective or otherwise supported its defense that Marjo has failed to state a claim, nor has it specifically opposed Marjo's motion for summary judgment on this defense. Therefore, there is no genuine issue of material fact with respect to the sufficiency of Marjo's complaint, and Marjo is entitled to summary judgment on Charter's first affirmative defense.

#### b. Fraudulent Inducement

Charter's second affirmative defense is that Marjo's "claims are barred in whole or in part by fraud in the inducement." (Id. ¶ 34.) Charter argues that McCall fraudulently induced it to enter the Lease by failing to inform Charter of both the nature of his interest in Marjo and the extent of his relationship with Jones. Specifically, Charter alleges that McCall affirmatively misrepresented that he intended to "invest" in Marjo, when ultimately he received an interest in Marjo without any capital contribution. Furthermore, Charter asserts that McCall fraudulently withheld information from Charter regarding his interest in Layjoy.

6

Charter's assertion that it was fraudulently induced to enter the contract fails for two reasons.  First, even if the court assumed that McCall's representation and omission were fraudulent and Charter reasonably relied upon them, Charter cannot claim that it was fraudulently induced to enter the contract because Charter affirmed the Lease after learning of the alleged fraud.  Second, Charter has failed to provide evidence creating a genuine issue of material fact with respect to several of the elements of fraud, which is necessary for Charter to proceed on its fraudulent inducement defense.  Specifically, (i) Charter had no right to rely on the allegedly fraudulent misrepresentation and omission; (ii) under the circumstances, even if Charter had a right to rely, McCall's representation and omission were not materially false; and (iii) McCall did not intend for Charter to rely on the allegedly fraudulent misrepresentation and omission.

(i.) Affirmation

Charter cannot assert an affirmative defense of fraudulent inducement because it affirmed the lease after learning of the alleged fraud.  It is undisputed that Charter did not attempt to terminate the Lease until May 2004, and before May 10, 2004, Charter never suggested that it had been induced into the Lease by fraud.  Rather than disclose that it was investigating the possibility that it was induced to enter the Lease by fraud, Charter contacted Marjo on March 1, 2004, and inquired as to how much it would cost for Charter to terminate the Lease.  (Pl.'s Mem. Opp'n Summ. J. Appx. Tab. 4 (Letter to Brenda Lewis at 1).)  After Marjo responded, "[W]e would welcome your offer of proposal to terminate the lease," Charter offered no proposal, but informed Marjo that it intended to terminate the Lease.  (Id. (Letter from Jones to Brenda Lewis of 3/31/04, at 2) & (Letter from Gordon Ankney to Jones

7

of 5/10/04, at 1).)  Nonetheless, it had come to Charter's attention that it was deceived by

McCall at least <u>nine months earlier</u>, in July 2003.  (<u>Id.</u>  (Letter from Gordon Ankney to Jones

of 5/10/04, at 1).)  In fact, Charter was aware of the fraud before July 2003.  In Charter's

answers and objections to Marjo's first set of interrogatories, Charter answered:

> As relevant to this action, Billy R. Jones and David McCall fraudulently
> omitted material facts from every communication they had with any Charter
> representative related to the real estate transactions that are the subject matter
> of Plaintiff's claim and Charter's counterclaim.  At no time did Mr. McCall or
> Mr. Jones disclose the nature and extent of their relationship or the impact that
> relationship had on Charter's business.  <u>Charter became aware of these
> fraudulent omissions in late 2002</u>.

(Defs.' Answers & Objections Pl.'s First Set of Interrogs. at 4) (emphasis added.)  Marjo

argues that, because Charter admitted to having known of the alleged fraud in 2002 but

continued enjoying the benefits of the Lease, Charter affirmed the lease and cannot now

attempt to void the Lease in an attempt to justify its breach.  The court agrees.

A contract procured by fraud is voidable.  <u>See</u> <u>Willms Trucking Co. v. JW Const.

Co.</u>, 442 S.E.2d 197, 202 (S.C. Ct. App. 1994).  However, "[i]t is a well-established

proposition that a voidable contract may be ratified by a party's failure to act promptly to

repudiate the contract."  <u>Hyman v. Ford Motor Co.</u>, 142 F. Supp. 2d 735, 748 (D.S.C.

2001).

Charter did not act promptly to repudiate the contract.  Charter has been vague as to

when, exactly, it learned of the alleged fraud.  On one hand, Charter claimed that it knew of

the alleged fraud in 2002.  (Defs.' Answers & Objections Pl.'s First Set of Interrogs. at 4.)

However, in response to Marjo's allegation that Charter affirmed the Lease after learning of

the fraud, Charter responded that it "cannot have waived affirmative defenses based on

fraudulent acts it had not identified before this litigation," arguing that it did not learn about specific details of the fraud until after filing this lawsuit, such as the fact that McCall received his interest in Layjoy without a capital contribution. (Defs.' Reply Supp. Summ. J. at 1 n.2 & 9-10.)

By its own admission, Charter knew of the allegedly fraudulent omissions in 2002 concerning the real estate transactions, including the fact that McCall had not disclosed the extent of his relationship with Jones. Nevertheless, Charter continued to represent to its shareholders that it was obligated by the Lease through its disclosures to the Securities Exchange Commission ("SEC"). These disclosures, furthermore, were approved by Charter's board of directors. (Pl.'s Resp. Opp'n Summ. J. 9-10.) Significantly, in referring to the Lease, Charter represented to the SEC and its shareholders the amount that it was paying on the Lease and that Charter "believe[d] that . . . the transaction[] was on terms no less favorable [to Charter] than could have been obtained from independent third parties." (Id. Appx. Tab II (SEC Disclosure filed May 1, 2000, at 1).) Furthermore, Charter continued to enjoy the benefits of the Lease at least from "late 2002" until May 2004 and made no mention to Marjo of the possibility Marjo had fraudulently induced Charter to enter the Lease, but rather inquired as to how much Marjo would charge Charter to terminate the Lease.

The court notes that, at oral argument, Charter could identify no specific facts that it knew in 2002 with respect to the alleged real estate fraud. (Summ. J. Hr'g Tr. 14-18, Aug. 24, 2005.) Instead Charter claims that it learned of McCall's receiving a gratuitous interest in Layjoy and Marjo after Marjo initiated this lawsuit, in 2005. (Defs.' Reply Supp. Summ. J. at 1 n.2.) The court finds that Charter knew the essential nature of the alleged fraud as early

as 1998, when McCall disclosed his wish to have an interest in Marjo and Layjoy, and Charter nevertheless entered into the transactions with those entities. Under these facts, the court concludes that Charter affirmed the Lease after knowing of the alleged fraud and cannot now rely on the alleged fraud to void the Lease.[3]

(ii) No Genuine Issue of Material Fact with Respect to<br>Multiple Elements of Fraud

Beyond affirming the Lease, Charter's fraudulent inducement defense fails because Charter had no right to rely on the allegedly fraudulent misrepresentation and omission. Moreover, McCall's representation was not false, the omission was not fraudulent, and Charter has failed to show that McCall intentionally made either the representation or the omission to induce Charter's performance.

"In order to establish a . . . defense of fraud in the inducement, a party must prove . . . [the] elements of the tort." Darby v. Waterboggan of Myrtle Beach, Inc., 344 S.E.2d

---

[3]Even assuming that Charter did not know of one or two specific facts related to the alleged fraud until Marjo filed this lawsuit, that does not permit Charter to continue to receive the benefits of a lease contract for years after knowing of the substance of the alleged fraud – that McCall was an interested party in these transactions and that the transactions may not have been fair to Charter. For this same reason, the court also rejects Charter's argument that the court consider the three-year statute of limitations applicable to claims of fraud to be a "reasonable time." Charter essentially knew of the alleged fraud as early as 1998 (as to the Lease) and August 2000, when it purchased the property from Marjo. Moreover, under circumstances like this, in which Marjo relied on the Lease to its detriment by constructing a building for Charter and Charter knew the essential elements of the fraud for years before seeking to void the Lease, the court finds that Beard v. Staton, 15 S.C. 164, 165 (S.C. 1881), which stated that the statute of limitations was a "convenient rule of restriction" and on which Charter relies, is inapplicable. Id. No published opinion in almost 120 years has relied on Beard for the proposition for which the defendants cite it.

10

153, 155 (S.C. Ct. App. 1986). Under South Carolina law, the elements of an action for

fraud based on misrepresentation are the following:

> (1) a representation; (2) falsity; (3) its materiality; (4) knowledge of the falsity
> or a reckless disregard of its truth or falsity; (5) intent that the representation be
> acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance
> upon the truth; (8) the hearer's right to rely thereon; and (9) the hearer's
> consequent and proximate injury.

Redwend Ltd. P'ship v. Edwards, 581 S.E.2d 496, 503-04 (S.C. Ct. App. 2003). "Fraud is

not presumed, but must be shown by clear, cogent, and convincing evidence." Ardis v. Cox,

431 S.E.2d 267, 269 (S.C. Ct. App. 1993). If Charter fails to produce evidence on any of

these elements, summary judgment on the fraud defense must be granted to Marjo. Brown v.

Stewart, 557 S.E.2d 676, 680 (S.C. Ct. App. 2001).

Charter claims that, when McCall sought permission to have an interest in Marjo,

McCall fraudulently misrepresented the circumstances by claiming that he wished to "invest"

in Marjo. Charter also argues that McCall fraudulently omitted disclosing his interest in

Layjoy and the nature of that interest, and that McCall was required to disclose that interest to

Charter before Charter entered into the Lease. The crux of Charter's allegations is that McCall

made an inaccurate and incomplete disclosure before Charter entered the Lease.

### (a.) No Right to Rely

Charter cannot prevail under its affirmative defense for fraudulent inducement because

it had no right to rely on the allegedly fraudulent misrepresentation and omission. "The right

to rely must be determined in light of the plaintiff's duty to use reasonable prudence and

diligence under the circumstances in identifying the truth with respect to the representations

made to him." Regions Bank v. Schmauch, 582 S.E.2d 432, 445 (S.C. Ct. App. 2003). "It is

11

the policy of the courts not only to discourage fraud, but also to discourage negligence and inattention to one's own interests." King v. Oxford, 318 S.E.2d 125, 128 (S.C. Ct. App. 1984). "Courts do not sit for the purpose of relieving parties who refuse to exercise reasonable diligence or discretion to protect their own interests." Id. "A party must avail himself of the knowledge or means of knowledge open to him. The court will not protect the person who, with full opportunity to do so, will not protect himself." Id. (internal citation omitted).

Before obtaining an interest in Marjo, McCall informed Charter's then chief executive officer, Jerald Kent ("Kent"), that he wished to invest "with Mr. Jones in a real estate venture whereby they would acquire property near Greenville, South Carolina, construct an office suitable for Charter and lease the facility to Charter." (Pl.'s Mem. Supp. Summ. J. Appx. Tab 2 (Kent Aff. ¶ 6).) Kent spoke with at least one of his business partners at Charter about McCall's proposed interest in the company, which Kent later learned was named Marjo, and they approved McCall's proposed interest with the conditions that McCall would have a

minority interest in Marjo, and the resulting lease would be fair to Charter.  (Id.)[4]  Kent claims

that he assumed that McCall would have an economic risk in the investment.  (Id. (Kent Aff.

¶ 8).)  After disclosing his wish to have an interest in Marjo, McCall disclosed to Kent that he

wished to invest in another company, which Kent later learned was called Layjoy.  McCall's

interest in Layjoy was approved under the same conditions as his interest in Marjo.  (Id. (Kent

Aff. ¶ 7).)  Subsequent to seeking permission to invest, McCall informed Charter about his

interest in Marjo on numerous other occasions, including such a disclosure to Marcy Lifton

("Lifton"), one of Charter's in-house lawyers, in the fall of 1999.  (Pl.'s Mem. Supp. Summ.

J. Appx. Tab 7 (Lifton Dep. at 25-26) & Appx. Tab (McCall Decl. ¶¶ 10-11).)  Charter cannot

claim that it was unaware of McCall's interest in Marjo, as it disclosed McCall's interest "in a

partnership that leases space to [Charter]" and how much that partnership had received under

the Lease to the SEC in November 1999.  (Pl.'s Mem. Supp. Summ. J. Appx. Tab 10 (Filing

of Nov. 1, 1999).)

      In light of these facts, Charter was on notice that McCall had an interest in Marjo and

Layjoy in 1998, interests which raised potential conflicts with his fiduciary obligations to

_____

      [4]It is unclear to the court when, precisely, Kent and others at Charter became aware of
the names of the entities, Marjo and Layjoy.  However, pursuant to Kent's declaration,
McCall disclosed his desire to obtain an interest in both entities in early 1998, before he
obtained an interest in either, and again disclosed his interest in Marjo in the fall of 1999.  To
the extent that Charter was unaware of the names of the entities in which McCall had an
interest as of 1999, Charter has no excuse, as there is no allegation that Charter ever inquired
about the names of the entities.  The court also notes that there is no dispute that McCall's
position with Charter gave him the authority over real estate transactions such as the Lease,
the amendment of the Lease, and the purchase of the property at 505 South Main Street.  By
approving McCall's interest in Marjo with the conditions set forth above, Charter permitted
McCall's involvement on behalf of Charter in all of the transactions with Marjo at issue in this
case.

Charter. Charter approved of McCall's dual interests, satisfied its obligations under the Lease for six years after knowing of those interests, and conducted no inquiry into the nature of McCall's interests or the reasonableness of the real estate transactions until January 2003.[5] The court finds that, even if McCall's alleged misrepresentation and omission were considered fraudulent, Charter had no right to rely on them, as it failed to exercise reasonable diligence or discretion to learn about the precise nature of the conflict which McCall disclosed. By disclosing his wish to obtain an interest in Marjo and Layjoy, McCall met his burden of notifying Charter of a potential conflict of interest. The court will not now permit Charter, six years later, to justify breaching the Lease on the basis that it was fraudulently induced to enter the contract when McCall disclosed the essential nature of his conflict of interest, and Charter asked no further questions about it. In sum, the court will not protect Charter when Charter took no steps to protect itself.[6]

(b.) No False Representation or Fraudulent Omission

In addition to Charter's having no right to rely, the court concludes that the allegedly fraudulent misrepresentation was not false, and that McCall had no duty to disclose the

---

[5]Charter has introduced a letter into evidence from Charter's in-house counsel to McCall's attorney requesting that McCall give a sworn statement about his relationship with Jones. (Defs.' Reply Supp. Summ. J. Ex. 3 (Letter from Curtis Shaw to David Harlan of 1/9/2003).) McCall resigned from Charter on January 31, 2003. (Id. Ex. 4 (McCall Resignation Letter).)

[6]Charter makes much ado over the fact that McCall used the word "invest" to describe his prospective interest in Marjo. Charter's claim that McCall defrauded it by using this word seemingly undermines Charter's right to rely on that statement; one may expect McCall to favor Marjo even more in a resulting lease between Charter and Marjo if his own capital in Marjo was at risk than if he had nothing to lose if Marjo became insolvent.

14

allegedly fraudulent omission. "Generally, the representation must relate to a present or pre-existing fact rather than a statement of future events or an unfulfilled promise." Brown, 557 S.E.2d at 680 (internal quotation marks omitted). "An exception to the general rule is recognized for unfulfilled promises which were made by a party who never intended to fulfill the promise and only made it to induce the performance of another party." Id. (internal quotation marks omitted).

There is no evidence that when McCall met with Kent to seek permission to obtain an interest in Marjo, he had already obtained that interest, or that he had obtained an interest in Layjoy. Both occurred after Charter gave McCall permission to hold interests in companies with which Charter conducted business. Hence, for Charter to overcome Marjo's motion for summary judgment on the basis that McCall misrepresented his intention about a future investment, Charter must show that McCall's statement was effectively an "unfulfilled promise[] which [was] made by a party who never intended to fulfill the promise and only made it to induce the performance of another party." Id. The court finds that Charter has failed to provide sufficient evidence to create a genuine issue of material fact with respect to this issue.

Charter contends that, when disclosing his wish to have an interest in Marjo, McCall used the word "invest" to suggest that he intended to invest capital in Marjo rather than receive a free interest in Marjo. Whether McCall invested money in Marjo or received a free interest in Marjo, however, is a distinction without a difference, given that McCall disclosed the essential nature of his conflict, and Charter approved the essential nature of that conflict. McCall wanted an ownership interest in Marjo, a company which profited from Charter.

Charter approved of McCall's interest in Marjo with conditions. Notably, none of these conditions required that McCall invest his own capital in Marjo. The conditions required that McCall have a minority interest in Marjo and that the Lease be fair to Charter. McCall's investment in Marjo met these requirements. Hence, the inference that McCall used the word "invest" to induce performance by Charter is unjustified, and McCall's use of the word "invest" to describe his wish to have an interest in Marjo in the future was not fraudulent. See Anderson, 477 U.S. at 255.

Charter also claims that McCall fraudulently failed to disclose information about his interest in Layjoy before Charter entered into the Lease. It is undisputed that McCall was in a fiduciary relationship with Charter in his executive role and that such a fiduciary relationship results in a fiduciary duty to disclose information. Regions Bank, 582 S.E.2d at 445-46. Accordingly, Charter argues that McCall had a duty to disclose his gratuitous interest in Layjoy before Charter entered into the Lease, and that, if Charter had known that McCall had an interest in Layjoy, Charter would not have approved the Lease. This argument is without merit.

McCall had no duty to disclose his interest in Layjoy, an entity which had no effect on the Lease, before Charter entered the Lease. While Charter has attempted to construe McCall's duty to disclose broadly to include a duty to disclose the extent of his relationship with Jones before Charter entered the Lease, the court is unaware of any South Carolina law that construes the duty to disclose so broadly. Nonetheless, considering the time line that Charter submitted to the court, McCall disclosed his interest in Layjoy before Charter entered into the Lease. Kent declared that, after McCall requested permission to have an interest in

16

Marjo, he also asked for permission to have an interest in the company which Kent later learned was Layjoy. McCall's request was approved. Under the chronologies that Charter relies upon in its motion for summary judgment, McCall received an interest in Layjoy on April 6, 1998, and Charter entered into the Lease on April 30, 1998. (Defs.' Mem. Supp. Summ. J. Exs. 12 (Marjo Chronology) & 14 (Layjoy Chronology).)[7] There is no evidence that McCall received his interest in Layjoy before requesting Kent's permission to have that interest. Therefore, there is no evidence that Charter lacked notice of McCall's interest in Layjoy <u>before</u> Charter entered the Lease.[8] Hence, the only information Charter lacked was the specifics of McCall's interest in Layjoy, particularly, whether he invested in Layjoy or received a gratuitous interest. The court finds that McCall's nondisclosure of the precise nature of his interest in an unrelated entity, Layjoy, was not a fraudulent omission for purposes of inducing Charter to enter into the Lease.

(c.) <u>No Evidence that McCall Intended Reliance on<br>His Representation and Omission</u>

Finally, Charter has not shown that McCall intended for Charter to rely on his use of the word "invest" or his failure to disclose his interest in Layjoy and the nature of the Layjoy

---

[7]While Marjo prepared the chronologies, Charter argues that the time lines show Marjo and Layjoy were related.

[8]In Charter's motion for summary judgment, Charter claims that McCall did not disclose his interest in Layjoy, citing McCall's deposition. In his deposition, McCall admits to failing to disclose his interest in Layjoy "and his interest in the building or property that was sold to Charter in 2000" in filling out the questionnaire for Charter's disclosures to the SEC. (Defs.' Mem. Supp. Summ. J. Ex. 3 (McCall Dep. at 79-81).) His nondisclosure on the questionnaire does not undermine the fact that he sought permission from Kent before obtaining an interest in both Marjo and Layjoy, and that Charter was on notice that he would have an interest in both before entering into the Lease.

17

interest.  There is evidence supporting the fact that business transactions between Charter and organizations owned by its employees were relatively common, and Charter has put forth no evidence to show that, in the past, Charter investigated the nature of the ownership interests Charter employees had in companies with which Charter did business.  Consistent with practice, there was no inquiry in this case.  (Pl.'s Mem. Supp. Summ. J. Appx. Tab 2 (Kent Decl. ¶ 8).)

Likewise, as McCall had no duty to disclose his prospective interest in Layjoy when Charter was considering the Lease, the court finds that Charter provides no evidence that McCall intended for Charter to rely on his omission in entering into the Lease.  Therefore, for the reasons set forth above and for those set out in Part II.B.1.b.(ii)(b.), Marjo is entitled to summary judgment on Charter's affirmative defense that it was induced by fraud to enter the Lease.

### c. Undue Influence

Charter's third affirmative defense is that Marjo's "claims are barred in whole or in part because [Marjo] unduly influenced Charter's manifestation of assent with respect to the subject transactions."  (Am. Answer ¶ 34.)  This defense fails.

"Generally, the party challenging [a contract] on the basis of undue influence must present evidence which unmistakenly and convincingly shows the [party's] will was overborne by the [defendant] or someone acting on his behalf."  Macaulay v. Wachovia Bank of S.C., N.A., 569 S.E.2d 371, 378 (S.C. Ct. App. 2002) (internal quotation marks omitted).  Although "the existence of a confidential relationship creates a presumption that the [contract] is invalid, and the burden then shifts to the proponent of the instrument to affirmatively show

the absence of undue influence," in this case the presumption is not applicable because McCall disclosed his conflict before Marjo and Charter entered the Lease. Id.

Before Charter entered the Lease, McCall disclosed his wish to obtain an interest in Marjo to Charter. Charter expressly approved that interest. Charter cannot now argue that McCall's influence over Charter was undue, when Charter approved of the interest before McCall had it, permitted McCall to negotiate the Lease on behalf of Charter, and publicly acknowledged McCall's interest in Marjo for years while both parties met their obligations under the Lease. Charter's defense that McCall unduly influenced Charter's entry into the Lease fails as a matter of law under these facts, and Charter lost its opportunity to raise the defense by acknowledging the conflict and failing to void the Lease for six years after entering into it.

### 2. Charter's Counterclaims

Charter raises six counterclaims. Marjo is entitled to summary judgment on all six counterclaims for the reasons set forth below.

#### a. Unjust Enrichment

Charter's first counterclaim is for unjust enrichment. In South Carolina, to state a claim for unjust enrichment and recover on a theory of restitution, Charter "must show (1) that [it] conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 167 (S.C. 2003). Charter argues that Marjo was unjustly enriched by Charter's lease payments from 1999 to 2003 and Charter's payment of $360,000 for the title to the

19

property at 505 South Main Street.  (Am. Answer ¶ 60.)  Charter claims that Marjo improperly received, accepted, and retained these amounts, and that Marjo should be compelled to return them.  (Id. ¶ 61, 62.)

There are numerous reasons why Charter's claim for unjust enrichment fails.  It is undisputed that Marjo built a building for Charter's use pursuant to the Lease, that Charter occupied this building, and that Charter enjoyed the benefits of the Lease until 2004.  As such, there is no question that Charter has benefitted from the Lease that it now claims unjustly enriched Marjo.  In addition, Charter identified no evidence, either its memorandum in opposition to Marjo's motion for summary judgment or at oral argument, to support its assertion that Charter overpaid on the Lease.[9]  Likewise, no evidence demonstrates that Charter paid an unreasonable amount for the property located at 505 South Main Street. Charter's suggestion that the price was unreasonable because it exceeded the amount Marjo had paid for the property almost two and a half years earlier is insufficient to create a genuine issue of material fact for trial.  At oral argument, Charter admitted that it lacked appraisals and has not alerted the court to any evidence, other than the price, to support its conclusion that Marjo was unjustly enriched by the amount of money it received from the sale of the property to Charter.  (Summ. J. Hr'g Tr. 30-32.)  Therefore, the court finds that there is no genuine issue

_____

[9]Charter's allegation that the Lease originally concerned the entire 6.15 acres but was amended to cover only 2 acres, without a decrease in the rental amount, would support a claim that Charter had overpaid rent under the Lease after the amendment.  However, in neither its memorandum opposing summary judgment nor at oral argument did Charter identify evidence in support of its claim that the Lease originally covered 6.15 acres.  (Summ. J. Hr'g Tr. 29.)  Therefore, there is no genuine issue of material fact with respect to Charter's allegation that the Lease originally covered 6.15 acres, and that allegation fails to support Charter's claim that it overpaid rent under the Lease.

of material fact as to whether Marjo was unjustly enriched due to the amount of money Charter paid under the Lease or to purchase the property from Marjo.

Beyond the fact that there is no evidence to support its claim for damages, Charter has no right to bring an unjust enrichment claim six years after it entered the Lease and four years after it purchased the property from Marjo. During this time, Charter was aware of how much it was paying on the Lease and how much it had paid for the property, and even represented to the SEC and its shareholders that the Lease was fair.[10] Under these circumstances, Charter is barred by the equitable doctrine of laches from asserting an unjust enrichment claim. Charter's delay in bringing its claim was unreasonable and prejudiced Marjo, which purchased the land in Mauldin, constructed the premises for Charter, and relied on the Lease for six years. See Cannon v. Cannon, 467 S.E.2d 132, 137 (S.C. Ct. App. 1996) ("[L]aches is an equitable doctrine consisting of the elements of (1) delay, (2) unreasonable delay, and (3) prejudice.") Finally, to the extent that Charter argues that its unjust enrichment claim stems from the fact that it was fraudulently induced to enter into the Lease and property sales contract, the court finds that argument unavailing for the reasons discussed in Part II.B.1.b.

b. Fraud, Fraud in the Inducement (as to McCall),
and Fraud in the Inducement (as to Marjo)

Charter's second, third, and fourth counterclaims concern McCall's allegedly fraudulent representation and omission in inducing Charter to enter the Lease, amend the Lease, and

-----

[10]Charter cannot credibly claim that it was unaware from whom it purchased the property at 505 South Main Street. Charter argues that it was renting that property from Marjo before the Lease was amended, and Charter purchased that property from Marjo in August 2000, just over a year after the Lease was amended.

21

purchase the lot at 505 South Main Street.  These counterclaims fail for the same reasons that

Charter's affirmative defenses fail, namely, because Charter affirmed the Lease and because

Charter has failed to produce evidence to create a genuine issue of material fact with respect to

several of the elements of fraud.  Charter's counterclaims for fraud and fraudulent inducement

also fail for two additional reasons: (1) they are barred by the statute of limitations and (2)

Charter has failed to provide evidence of its damages.

Under South Carolina's discovery rule, Charter cannot assert a claim for fraud or fraud

in the inducement if Charter "knew or by the exercise of reasonable diligence should have

 known that [it] had a cause of action."  S.C. Code Ann. § 15-3-535 (Law. Co-Op. 2005).[11]

Charter failed to exercise reasonable diligence in inquiring as to what it now asserts were

fraudulent representations or omissions by McCall, which occurred in 1998.  Because Charter

did not raise its counterclaims until December 20, 2004, Charter's fraud claims are time-barred

under section 15-3-535.

Charter's counterclaims for fraud and fraud in the inducement are also barred because

Charter has failed to provide evidence of damages.  Charter must allege and prove that it was

damaged in order to prevail on its tort claims for fraud and fraudulent inducement.  See Collins

Music Co. v. FMW Corp., 586 S.E.2d 128, 131 (S.C. 2003).  As discussed in Part II.B.2.a.,

---

[11]Charter argues that the statute of limitations should not begin to run until Charter "actually discovered" the fraud in 2003. (Defs.' Mem. Opp'n Summ. J. at 3-5.)  As noted above, Charter admitted to knowing at least some of the alleged fraud in late 2002. Moreover, with any exercise of diligence, Charter could have inquired and learned of the alleged fraud concerning the Lease as early as 1998,when McCall disclosed his wish to obtain an interest in Marjo.  Adopting Charter's argument and allowing Charter to run the statute of limitations from when it actually knew of the fraud inspires precisely the kind of negligence in contracting South Carolina courts endeavor to prevent.  See King, 318 S.E.2d at 128.

Charter has failed to identify a genuine issue of material fact to survive summary judgment on the issue that it was damaged by the alleged fraud.  There is no evidence, beyond a speculative comparison of prices, which supports Charter's position that it was harmed by the allegedly fraudulent acts.  As such, Marjo is entitled to summary judgment on Charter's counterclaims for fraud and fraudulent inducement.[12]

c. Undue Influence

Marjo's fifth counterclaim is that McCall and Marjo unduly influenced Charter's entry into the Lease.  Undue influence, like unjust enrichment, is an equitable remedy.  Dixon v. Dixon, 608 S.E.2d 849, 855 (S.C. 2005).  For the same equitable reasons that Charter cannot, as a matter of law, recover from Marjo on its claim for unjust enrichment, it cannot recover from Marjo on its claim for undue influence.  Additionally, Charter has failed to produce evidence to create a genuine issue of material fact with respect to damages that it purportedly suffered from the alleged undue influence.

---

[12]Charter requests that the court void the contract as relief for its two counterclaims for fraudulent inducement.  However, Charter also requests Ten Million Dollars ($10,000,000.00) in punitive damages, which suggests that Charter seeks to affirm the Lease and recover in tort.  South Carolina law permits Charter to seek either a contract remedy, which would be recission and expectancy damages, or a tort remedy, which would result in Charter affirming the contract, but possibly recovering consequential and punitive damages. See Baeza v. Robert E. Lee Chrysler, Plymouth, Dodge, Inc., 309 S.E.2d 763, 766 (S.C. Ct. App. 1983).  Charter is not entitled to recission of the Lease for the equitable reasons set forth in Part II.B.2.a., the analysis concerning Charter's counterclaims for unjust enrichment.  Likewise, Charter is not entitled to recovery on the torts of fraud and fraudulent inducement for the reasons discussed above.

23

d.  SCUTPA Claim

Charter's sixth and final counterclaim is that Marjo violated SCUTPA when it sold

Charter the Mauldin property.  "South Carolina courts have required that a plaintiff bringing a

private cause of action under UTPA allege and prove the defendant's actions adversely affected

the public interest." Daisy Outdoor Advertising Co. v. Abbott, 473 S.E.2d 47, 49 (S.C.

1996).  "[P]roof of the potential for repetition of a defendant's actions satisfies the public

interest requirement of UTPA." Id.  Marjo argues that Charter cannot proceed because there

is no possibility of repetition of the act.  Charter argues that there is a potential for repetition

because the Marjo and Layjoy schemes were very similar, indicating a possibility that such a

scheme could potentially occur in the future. See id. at 51.

Charter's argument is unavailing despite similarities in the alleged Layjoy and Marjo

schemes.  What made the schemes allegedly fraudulent was the presence of McCall on both

sides of the transactions – Charter and Layjoy and Charter and Marjo – having allegedly

misrepresented and omitted the extent of his conflict of interest.  However, it is undisputed that

McCall no longer works for Charter, and Charter has not alleged that other employees at

Charter were involved in the schemes.  Nor has Charter substantiated any possible claim that

Charter's "procedures create a potential for repetition of the unfair and deceptive acts." See

id. at 51.  Hence, the court finds that there is no potential for the allegedly fraudulent schemes

to recur, and Charter's SCUTPA claim fails as a matter of law.

### C.  Charter's Motion for Summary Judgment

Charter moved for summary judgment on each of Marjo's three causes of action.

Charter alleges that Marjo's "fraudulent conduct prevented it from obtaining a binding contract

24

or promise from Charter, and therefore, it cannot recover for breach of contract, promissory estoppel or tortuous interference with contract." (Defs.' Mot. Summ. J. 1-2.) As set forth above in Part II.B, the court grants summary judgment in favor of Marjo for breach of lease in part because there is no genuine issue of material fact with respect to Charter's assertion that Marjo fraudulently induced Charter to enter into the Lease. For this reason, Charter's motion for summary judgment is denied.

It is therefore

**ORDERED** that Marjo's motion for partial summary judgment, document number 89, is granted. It is further

**ORDERED** that Charter's motion for summary judgment, document number 90, is denied.

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
September 8, 2005